# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 11, 2013  Decided March 14, 2014

No. 12-5183

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS,
APPELLANT

v.

NATIONAL INSTITUTES OF HEALTH, DEPARTMENT OF HEALTH
AND HUMAN SERVICES,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01818)

---

*Eric R. Glitzenstein* argued the cause for appellant. With
him on the briefs were *Katherine Anne Meyer* and *Jessica Almy*.

*Marina Utgoff Braswell*, Assistant U.S. Attorney, argued
the cause for appellee. With her on the brief were *Ronald C.
Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant
U.S. Attorney.

Before: HENDERSON, GRIFFITH and SRINIVASAN, *Circuit
Judges*.

2

SRINIVASAN, *Circuit Judge*: This case involves two Freedom of Information Act (FOIA) requests submitted by People for the Ethical Treatment of Animals (PETA) to the National Institutes of Health (NIH). PETA requested records concerning NIH investigations of animal abuse at a university research lab, and specifically sought documents related to any investigations into complaints filed against three identified researchers. NIH issued *Glomar* responses, meaning that the agency refused to confirm or deny the existence of responsive documents on the ground that acknowledging their existence would itself undercut privacy interests protected by FOIA.

PETA challenged NIH's *Glomar* responses in district court. The district court determined that any NIH acknowledgment of the existence of responsive records would reveal that the agency had investigated the three researchers. The court therefore upheld NIH's *Glomar* responses under FOIA Exemption 7(C), which permits withholding law enforcement information or records if disclosure could entail an unwarranted invasion of personal privacy.

We affirm the validity of NIH's *Glomar* responses as to any documents that would reveal whether NIH had investigated the three researchers. But we understand PETA's request to encompass additional types of documents that, insofar as they may exist, would not disclose any investigations of the three researchers. We therefore vacate in part the district court's grant of summary judgment to NIH.

3

I.

A.

NIH, an agency within the Department of Health and Human Services, provides federal funding for medical research, including research involving animals. NIH grant recipients must adhere to certain policies concerning the humane treatment of laboratory animals. The NIH Office of Laboratory Animal Welfare (OLAW) investigates allegations that grant recipients have violated NIH policies. Universities receiving NIH funding must establish an Institutional Animal Care and Use Committee, which bears responsibility for monitoring compliance with NIH guidelines and reporting any violations to OLAW.

PETA is a non-profit organization that advocates for animal rights. Among its activities, PETA investigates the abuse of animals in research laboratories. This case concerns PETA's efforts to investigate the treatment of laboratory animals at the Scott-Ritchey Research Center at Auburn University, a state university in Alabama that receives NIH funding for animal research.

PETA reports that, in early 2005, it placed an undercover investigator in one of Auburn's research laboratories. Over an eight-month period, the investigator allegedly documented numerous violations of the Animal Welfare Act as well as the misappropriation of NIH funds. On the basis of that information, PETA assembled a written complaint. The complaint names researchers who also are the subjects of PETA's FOIA requests at issue here.

PETA states that it sent its complaint to NIH, but it is unclear from the record whether the agency received it. PETA also filed its complaint with the United States Department of

Agriculture (USDA). In response to a subsequent FOIA request, USDA released the complaint in largely unredacted form. USDA also released an investigatory report that had concluded that the complaint was "partially valid."

B.

PETA filed three requests under FOIA with NIH seeking records related to Auburn University. First, on February 28, 2006, PETA filed a request "for copies of all OLAW files concerning Auburn University." NIH identified several hundred pages of responsive documents, but withheld or redacted most of them. PETA's first FOIA request is not at issue in this appeal.

On July 25, 2007, PETA filed a second FOIA request with NIH, framed as follows:

> Pursuant to the federal Freedom of Information Act, 5 U.S.C. § 552, People for the Ethical Treatment of Animals (PETA) requests copies of all official investigative reports, preliminary notes, testimonies, memos, meeting minutes, phone conversations, emails and other materials related to all National Institutes of Health (NIH) investigations into complaints filed in 2005-present regarding [three specifically named NIH grant recipients] at Auburn University's Scott-Ritchey Research Center in Auburn, AL.

NIH issued a *Glomar* response, refusing to confirm or deny the existence of any responsive documents. NIH stated that any such records would be exempt from disclosure under FOIA Exemption 6, 5 U.S.C. § 552(b)(6), which protects against clearly unwarranted invasions of personal privacy.

On May 20, 2008, PETA sought certain documents from Auburn University pursuant to Alabama's Open Records Act. In response, Auburn's general counsel informed PETA that PETA's activities had "resulted in an investigation by NIH." The general counsel explained, however, that the university was unable to disclose any further information because the investigation was ongoing and the university had entered into a confidentiality agreement with NIH.

On August 21, 2008, PETA sent a third FOIA request to NIH, this time seeking "[c]opies of any signed confidentiality agreement between Auburn University and NIH relating to materials and information with regard to an investigation into the research of [a specifically named NIH grant recipient] and colleagues." The request named one of the same researchers who had been named in PETA's second request. NIH issued another *Glomar* response, again invoking FOIA Exemption 6. PETA filed an administrative appeal concerning its second and third requests. The Department of Health and Human Services, NIH's parent organization, issued a final decision affirming the agency's *Glomar* responses under Exemptions 6 and 7(C).

PETA then initiated the present action in the district court challenging NIH's *Glomar* responses to the second and third requests. The district court granted summary judgment to NIH. The court upheld the responses under FOIA Exemption 7(C), 5 U.S.C. § 552(b)(7)(C), which exempts from disclosure law enforcement records and information whose release could constitute an unwarranted invasion of personal privacy. *PETA v. NIH*, 853 F. Supp. 2d 146, 154-59 (D.D.C. 2012). The court determined that acknowledging the existence of documents responding to PETA's requests would confirm that NIH had investigated the three named researchers. *Id.* at 155. Such a confirmation, the court reasoned, would "go[] to the heart of the privacy interest that Exemption 7(C) was designed to protect."

*Id.* Concluding that any public interest in disclosure failed to outweigh the privacy interests at stake, the district court upheld NIH's *Glomar* responses. *Id.* at 159. PETA now appeals, challenging the validity of NIH's *Glomar* responses to the second and third requests.

## II.

The Freedom of Information Act "implement[s] a general philosophy of full agency disclosure." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 754 (1989) (internal quotation marks omitted). The statute "requires every federal agency, upon request, to make 'promptly available to any person' any 'records' so long as the request 'reasonably describes such records.'" *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003) (quoting 5 U.S.C. § 552(a)(3)). Agencies have "a duty to construe a FOIA request liberally." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995). An agency can withhold or redact documents only if the information falls within one of nine statutory exemptions. *See* 5 U.S.C. § 552(b)(1)-(9). The agency bears the burden of establishing that an exemption applies. *Reporters Comm.*, 489 U.S. at 755. An agency ordinarily must search for any documents responsive to the request, and must "disclose all reasonably segregable, nonexempt portions of the requested record(s)." *Assassination Archives*, 334 F.3d at 58 (citing 5 U.S.C. § 552(b)).

In certain cases, merely acknowledging the existence of responsive records would itself "cause harm cognizable under [a] FOIA exception." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)) (internal quotation mark omitted). In that event, an agency can issue a *Glomar* response, refusing to confirm or deny its possession of responsive documents. The *Glomar* response

takes its name from the CIA's refusal to confirm or deny the existence of records about "the *Hughes Glomar Explorer*, a ship used in a classified [CIA] project 'to raise a sunken Soviet submarine from the floor of the Pacific Ocean to recover the missiles, codes, and communications equipment onboard for analysis by United States military and intelligence experts.'" *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1171 (D.C. Cir. 2011) (quoting *Phillippi v. CIA*, 655 F.2d 1325, 1327 (D.C. Cir. 1981)). A *Glomar* response is valid "if the fact of the existence or nonexistence of agency records falls within a FOIA exemption." *Wolf*, 473 F.3d at 374.

Courts can grant summary judgment upholding a *Glomar* response based on agency affidavits explaining the basis for the response. Affidavits must contain "reasonable specificity of detail rather than merely conclusory statements" and cannot be "called into question by contradictory evidence in the record." *Elec. Privacy Info. Ctr. v. Nat'l Sec. Agency*, 678 F.3d 926, 931 (D.C. Cir. 2012) (internal quotation marks omitted). Contrary to PETA's assertions, to the extent the circumstances justify a *Glomar* response, the agency need not conduct any search for responsive documents or perform any analysis to identify segregable portions of such documents. *See Wolf*, 473 F.3d at 374 n.4; *Elec. Privacy Info. Ctr.*, 678 F.3d at 934.

In this case, NIH justifies its *Glomar* responses under FOIA Exemptions 6 and 7(C). Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). PETA does not dispute that any responsive

documents would constitute "records or information compiled for law enforcement purposes" for purposes of Exemption 7(C). Because "Exemption 7(C)'s privacy language is broader than the comparable language in Exemption 6," *Reporters Comm.*, 489 U.S. at 756, we confine our analysis to Exemption 7(C).

## III.

We review de novo the district court's conclusion that Exemption 7(C) justifies NIH's *Glomar* responses to PETA's second and third FOIA requests. That exemption supports a *Glomar* response if acknowledgment of responsive documents "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). To answer that question, we "weigh the public interest in the release of information against the privacy interest in nondisclosure." *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003). We consider PETA's second and third FOIA requests in turn.

## A.

PETA's second FOIA request encompasses "materials related to all [NIH] investigations into complaints . . . regarding [the three named researchers] at Auburn University's Scott-Ritchey Research Center." We conclude that a *Glomar* response is warranted for the heartland of responsive documents, but we hold that NIH's across-the-board *Glomar* response is unjustified because certain types of responsive documents would fall outside of Exemption 7(C).

## 1.

PETA's second request by its terms—and at its core—seeks disclosure of records that would confirm that NIH

had investigated the three researchers. We agree with the district court that Exemption 7(C) justifies a *Glomar* response for any such documents.

Courts have repeatedly recognized the "substantial" privacy interest held by "the targets of law-enforcement investigations . . . in ensuring that their relationship to the investigations remains secret." *Roth*, 642 F.3d at 1174 (internal quotation marks omitted). In *Jefferson v. Department of Justice*, 284 F.3d 172, 180 (D.C. Cir. 2002), for instance, we emphasized an Assistant U.S. Attorney's strong privacy interest in avoiding the disclosure of any investigation of misconduct. *See also Schrecker*, 349 F.3d at 666 ("We have long recognized . . . that 'the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation.'" (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990))). The same concerns exist in the context of non-criminal investigations, including investigations of federal research-grant recipients. *See McCutchen v. U.S. Dep't of Health & Human Servs.*, 30 F.3d 183, 187 (D.C. Cir. 1994) (noting that allegations of "plagiarism, fabrication of research results, and similar breaches of academic integrity . . . carry a stigma and can damage a career."). Here, as the district court observed, acknowledging an NIH investigation of any of the named researchers would "go[] to the heart of the privacy interest that Exemption 7(C) was designed to protect." *PETA*, 853 F. Supp. 2d at 155. Indeed, "[t]here can be no clearer example of an unwarranted invasion of personal privacy than to release to the public that another individual was the subject of [a law enforcement] investigation." *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 864 (D.C. Cir. 1981) (quoting *Baez v. Dep't of Justice*, 647 F.2d 1328, 1338 (D.C. Cir. 1980)).

PETA considers the privacy interest to be materially diminished in this case for two reasons, neither of which is persuasive. First, PETA observes that, because its request names three individuals, an acknowledgment by NIH of responsive documents would stop short of identifying which specific one (or ones) of the three researchers had been investigated. But even if the privacy interest may be lessened to a degree when the affected individual is identified as among three persons of whom one (or more) was the subject of an investigation—as compared with a situation in which a single individual is revealed to have been the subject of an investigation—there is still a substantial privacy interest at stake in the former circumstance. Official acknowledgment that there was an NIH investigation of at least one—and quite possibly all three—of the identified researchers would "engender comment and speculation and carr[y] a stigmatizing connotation." *Fitzgibbon*, 911 F.2d at 767.

Second, PETA notes that other entities, including USDA and Auburn, have publicly acknowledged complaints and investigations involving the named researchers. But "the fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information." *Reporters Comm.*, 489 U.S. at 770 (internal quotation marks omitted). Here, notwithstanding other entities' acknowledgment of investigations, NIH's own official acknowledgment that it had investigated the named researchers would carry an added and material stigma. That conclusion is bolstered by *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999), and *Moore v. CIA*, 666 F.3d 1330, 1333 n.4 (D.C. Cir. 2011). In both cases, we upheld CIA *Glomar* responses even though other agencies had previously disclosed responsive information. Although *Frugone* and *Moore* did not specifically involve Exemption 7(C), they rest on the special significance of official acknowledgment by the agency itself. That significance

tips the balance here towards the researchers' privacy interest, despite the third-party disclosures.

In light of the substantial privacy interests at stake, Exemption 7(C) authorizes a *Glomar* response unless the public interest in disclosure is strong enough to justify the privacy invasion. PETA "must show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake," and also that "the information is likely to advance that interest." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004). In addition, the only cognizable public interest under FOIA is "the citizens' right to be informed about what their government is up to." *Reporters Comm.*, 489 U.S. at 773 (internal quotation marks omitted). There is thus no cognizable FOIA interest in examining whether private individuals conduct animal research in an appropriate manner: that interest does not speak directly to *governmental* activity. *See id.*

On the other hand, there is a cognizable public interest in learning how NIH handles complaints concerning animal abuse and misappropriation of federal research funds. Responsive documents might illuminate various aspects of NIH's operations, including how the agency decides whether to investigate complaints and how it conducts investigations. PETA asserts that it seeks to uncover precisely that sort of information. Any such information would advance the public interest in "shed[ding] light on an agency's performance of its statutory duties." *Id.*; *see also Nation Magazine*, 71 F.3d at 894-95 ("[T]he mere fact that records pertain to an individual's activities does not necessarily qualify them for exemption. Such records may still be cloaked with the public interest if the information would shed light on agency action.").

In the circumstances of this case, however, we conclude that the public interest in understanding the agency's investigatory processes fails to outweigh the researchers' substantial interest in nondisclosure. We have consistently held that Exemption 7(C) authorizes *Glomar* responses to comparable FOIA requests seeking information about particular individuals. For example, in *Jefferson*, we considered a request seeking investigatory records concerning a specific Assistant U.S. Attorney. 284 F.3d at 175. We not only upheld the agency's *Glomar* response as to that part of the request, but we found the "result virtually compelled by" our decisions. *Id.* at 179 (citing *Kimberlin v. Dep't of Justice*, 139 F.3d 944, 948 (D.C. Cir. 1998)); *see also Beck v. Dep't of Justice*, 997 F.2d 1489, 1493-94 (D.C. Cir. 1993) (upholding *Glomar* response to request for any complaints or other investigatory files concerning two named Drug Enforcement Administration agents); *Dunkelberger v. Dep't of Justice*, 906 F.2d 779, 782 (D.C. Cir. 1990) (upholding *Glomar* response to request for a specific FBI agent's disciplinary records). In each of those cases, the FOIA request implicated the public interest in shedding light on agency investigatory procedures—the same interest PETA asserts here. Yet we have consistently found that interest, without more, insufficient to justify disclosure when balanced against the substantial privacy interests weighing against revealing the targets of a law enforcement investigation. We see no reason to reach a different conclusion here.

That result is fully consistent with our decision in *Nation Magazine*, 71 F.3d at 892-96, on which PETA substantially relies. There, the plaintiff magazine filed a FOIA request with the U.S. Customs Service for any documents pertaining to then-presidential candidate H. Ross Perot. *Id.* at 888. Perot had publicly stated that he had offered to assist the Customs Service in its drug interdiction efforts. *Id.* at 896. The magazine wished to determine the extent to which the agency had accepted Perot's

offers and privatized some of its operations. *Id.* at 895-96. We rejected the Customs Service's *Glomar* response. *Id.* at 893. Noting the cognizable public interest in learning how the "agency responded to [Perot's] overtures," we held that the agency's categorical policy of issuing a *Glomar* response for any request naming an individual was too broad. *Id.* at 895.

Here, the privacy interest is considerably stronger than in *Nation Magazine*. Whereas *Nation Magazine* concerned Perot's efforts to assist the Customs Service, PETA's request relates to *investigations* of the three named researchers. As we observed in *Nation Magazine*, "records discussing offers of assistance may implicate a less substantial privacy interest than any records associating Perot with criminal activity." *Id.* at 894. Additionally, Perot himself had publicly disclosed some of his communications with the agency. *Id.* at 896. Here, by contrast, neither the named researchers nor NIH have made any public disclosures. The material difference in the character of the privacy interests at stake in the two cases calls for a different conclusion here than in *Nation Magazine*.

For these reasons, we hold that NIH may issue a *Glomar* response as to any documents that would confirm the existence of an investigation into the three named researchers.

2.

If PETA's second request were confined to records revealing the existence of an investigation of the three researchers, NIH's blanket *Glomar* response would be fully warranted and our analysis of that request would be at an end. The district court construed the second request in precisely that fashion. *See PETA*, 853 F. Supp. 2d at 155 ("There is no question that a response from the agency acknowledging the existence of the records . . . would confirm that those three

individuals were being or had been investigated."). That interpretation is understandable. PETA framed the request to encompass "materials related to all [NIH] investigations into complaints . . . regarding" the three researchers. So framed, the request is amenable to an understanding under which it seeks only documents connected to an ongoing or past investigation of the three individuals, the disclosure of which would necessarily reveal the existence of such an investigation.

In view of the duty to construe FOIA requests liberally, however, *see Nation Magazine*, 71 F.3d at 890, we understand PETA's second request more broadly to reach two additional categories of documents, neither of which would necessarily reveal an investigation of the researchers. First, NIH could possess documents showing that the agency had received complaints about the researchers that it elected *not* to investigate. PETA's request includes any records "related to" NIH investigations—not just records of actual investigations. *See id.* (emphasizing the broadening effect of the phrase "pertaining to"). The request therefore encompasses the stages antecedent to an investigation, including documents explaining why an investigation did or did not occur. PETA, for example, hypothesizes an internal NIH memorandum acknowledging the receipt of PETA's complaint but stating that the agency would decline to investigate it due to a lack of resources.

PETA argues that Exemption 7(C) does not justify a *Glomar* response for that type of records, reasoning that there could be no privacy interest in confirming the *absence* of an investigation. We conclude, however, that a *Glomar* response is valid for such records. If NIH were required to acknowledge responsive documents in instances where there was no investigation but were permitted to give a *Glomar* response in cases where there had been one, it would become apparent that a *Glomar* response really meant that an investigation had

occurred. The agency must be permitted to issue a *Glomar* response in both situations to maintain the uncertainty essential to *Glomar*'s efficacy. We therefore hold that NIH can issue a *Glomar* response with regard to documents showing that the agency received complaints about the researchers but declined to conduct an investigation in response.

There also exists a second category of responsive documents beyond those that would necessarily reveal an investigation of the three researchers: documents showing that NIH responded to complaints about the three researchers by conducting an investigation that did not target the researchers themselves. Although PETA's request presupposes a complaint filed against the named researchers, the request, broadly construed, encompasses documents relating to *any* ensuing investigation. So, for example, if NIH responded to a complaint against the researchers by investigating whether Auburn's Institutional Animal Care and Use Committee was performing proper oversight, any documents related to that investigation would fall within the terms of the second request.

We conclude that Exemption 7(C) does not justify a *Glomar* response for that category of responsive documents. Because there would be no disclosure of the existence of an investigation of the named researchers, the privacy interest at stake would be diminished. On the other side of the balance, the circumstances would directly implicate the cognizable public interest in shedding light on NIH's investigatory processes. *See Reporters Comm.*, 489 U.S. at 773. Acknowledging an investigation that did *not* target the researchers would serve to advance that public interest without unduly compromising the researchers' privacy interests. We therefore hold that disclosure of documents of that type could not "reasonably be expected to constitute an unwarranted invasion of personal privacy" for

purposes of Exemption 7(C), 5 U.S.C. § 552(b)(7)(C); *cf. Nation Magazine*, 71 F.3d at 893-95.

Because there exists a category of responsive documents for which a *Glomar* response would be unwarranted, NIH's assertion of a blanket *Glomar* response to the second request cannot be sustained. We thus vacate the district court's grant of summary judgment to NIH as to PETA's second request. On remand, NIH must search for any documents showing that, in response to complaints filed against the named researchers, the agency conducted an investigation other than one targeting the researchers. But NIH still may issue a narrowed *Glomar* response for any documents revealing whether the agency investigated the researchers themselves. *See Am. Civil Liberties Union v. CIA*, 710 F.3d 422, 434 & n.13 (D.C. Cir. 2013) (contemplating assertion of a "more limited *Glomar* response" on remand); *Nation Magazine*, 71 F.3d at 895-96 (same).

B.

PETA's third FOIA request seeks copies of any confidentiality agreement between Auburn University and NIH "relating to materials and information with regard to an investigation into the research of [a named researcher] and colleagues." NIH's acknowledgment of responsive documents would confirm that the agency had investigated the researchers, implicating substantial privacy interests at the core of Exemption 7(C). Although there may be a cognizable public interest in understanding how NIH uses confidentiality agreements when conducting investigations, that interest alone cannot overcome the substantial privacy interests at stake. *See* Part III.A.1, *supra*. PETA of course remains free to formulate a new FOIA request pertaining to NIH's use of confidentiality agreements without tying the request to investigations of specific researchers.

* * *

We vacate the district court's grant of summary judgment to NIH in connection with PETA's second FOIA request and remand for proceedings consistent with this opinion.  We affirm the grant of summary judgment to NIH as to PETA's third FOIA request.