# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 4, 2024          Decided July 18, 2025

No. 22-5303

PROJECT FOR PRIVACY AND SURVEILLANCE ACCOUNTABILITY,
INC.,
APPELLANT

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-03657)

———

*Gene C. Schaerr* argued the cause for appellant. With him
on the briefs was *Brian J. Field*.

*Bradley G. Silverman*, Assistant U.S. Attorney, argued the
cause for appellees. With him on the brief were *Matthew M.
Graves*, U.S. Attorney at the time the brief was filed, and *Brian
P. Hudak* and *Jane M. Lyons*, Assistant U.S. Attorneys. *R.
Craig Lawrence*, Assistant U.S. Attorney, entered an
appearance.

Before: SRINIVASAN, *Chief Judge*, MILLETT and WILKINS,
*Circuit Judges*.

Opinion for the court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:   The Project for Privacy and Surveillance Accountability, Inc. ("Project") filed Freedom of Information Act ("FOIA") requests with six intelligence agencies seeking all documents, reports, memoranda, or communications regarding the upstreaming and unmasking of forty-eight named current and former members of congressional intelligence committees, from January 1, 2008, to January 15, 2020.  All six agencies issued *Glomar* responses in which they refused to confirm or deny whether they had responsive records on the ground that the existence or nonexistence of such records was itself protected from disclosure under multiple FOIA exemptions, including Exemption 1, which covers classified national security materials.  The Project filed a lawsuit challenging the agencies' *Glomar* responses.   The district court granted summary judgment for the agencies.  We affirm because the agencies' *Glomar* responses were proper under FOIA's first exemption.

**I**

**A**

FOIA generally requires federal agencies to disclose their records upon request unless those records fall within one of the statute's nine exemptions.   5 U.S.C. § 552(a)–(b); *see Department of Justice v. Julian*, 486 U.S. 1, 8 (1988).  While FOIA generally "calls for broad disclosure of Government records," the statute exempts certain records from disclosure where "legitimate governmental and private interests could be harmed by release[.]" *Julian*, 486 U.S. at 8 (quotation marks and citation omitted).  In that way, FOIA "balance[s] the public's need for access to official information with the

Government's need for confidentiality." *Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 144 (1981).

To withhold information under a FOIA exemption, an agency usually must "acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information." *Knight First Amend. Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 813 (D.C. Cir. 2021) (quoting *Roth v. Department of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011)). But sometimes even acknowledging the "existence or nonexistence of agency records" could harm interests protected by the exemptions. *Id.* (quotation marks omitted). In those cases, the agency may "'refuse to confirm or deny the existence' of the requested records" through what is known as a "*Glomar* response." *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)).[1]

The agencies in this case invoked FOIA Exemptions 1, 3, 6, and 7. 5 U.S.C. § 552(b)(1), (3), (6), (7)(A), (7)(C), (7)(E). As relevant here, Exemption 1 authorizes an agency to withhold information that is "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and" is "properly classified pursuant to such Executive order[.]" *Id.* § 552(b)(1).

The relevant executive order in this case is Executive Order 13,526. That Order allows for classification of

---

[1] The *Glomar* response gets its name from a case in which the Central Intelligence Agency refused to confirm or deny whether it had records about an alleged operation involving a research ship called the Hughes Glomar Explorer. *See Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976).

information when an "original classification authority"—that is, an individual authorized by the Order to classify information in the first instance—"determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, * * * and the original classification authority is able to identify or describe the damage." *See* Classified National Security Information, Exec. Order No. 13,526, § 1.1(a)(4), 75 Fed. Reg. 707, 707 (Dec. 29, 2009). Information that meets the substantive criteria of Executive Order 13,526 and is properly classified pursuant to that Order can be validly withheld under Exemption 1. *Schaerr v. Department of Justice*, 69 F.4th 924, 929–930 (D.C. Cir. 2023).[2]

**B**

According to the complaint, the Project is a non-profit corporation that "advocates for greater privacy and civil liberty protections from government surveillance, and seeks to hold such programs accountable to constitutional and statutory limitations." J.A. 10 (Compl. ¶ 5). In January 2020, the Project filed identical FOIA requests with the Department of Justice, the Office of the Director of National Intelligence ("ODNI"), the National Security Agency ("NSA"), the Federal Bureau of Investigation, the Central Intelligence Agency, and the Department of State. The requests sought:

1. All documents, reports, memoranda, or communications regarding the unmasking—including all unmasking requests—of any person [on the Project's list] from January 1, 2008, to January 15, 2020;

---

[2] Because this case can be resolved under Exemption 1, we need not address the other exemptions invoked by the agencies.

2. All documents, reports, memoranda, or communications regarding the upstreaming—including all requests for upstreaming—of any individual [on the list] from Jan. 1, 2008, to Jan. 15, 2020.

*See* J.A. 17–23 (Compl. ¶¶ 27, 33, 38, 44, 50, 55). The relevant list of persons about whom records were sought consists of forty-eight then-current or former members of congressional intelligence committees.[3]

"Upstreaming" and "unmasking" refer to agency practices governed by the Foreign Intelligence Surveillance Act ("FISA"), Pub. L. No. 95-511, 92 Stat. 1783 (1978) (codified as amended at 50 U.S.C. § 1801 *et seq.*). FISA authorizes and regulates "certain governmental electronic surveillance of communications for foreign intelligence purposes." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013); *see Schaerr*, 69 F.4th at 926. Specifically, FISA authorizes "the targeting of persons reasonably believed to be located outside the United States to acquire foreign intelligence information." 50 U.S.C. § 1881a(a). As relevant here, FISA prohibits the intentional

---

[3] The Project's FOIA requests sought records about: Adam Schiff, Jim Himes, Terri Sewell, Andre Carson, Jackie Speier, Mike Quigley, Eric Swalwell, Joaquin Castro, Denny Heck, Peter Welch, Sean Patrick Maloney, Val Demings, Raj Krishnamoorthi, Devin Nunes, Mike Conaway, Michael Turner, Brad Wenstrup, Chris Stewart, Rick Crawford, Elise Stefanik, Will Hurd, John Ratcliffe, James Risch, Marco Rubio, Susan Collins, Roy Blunt, Tom Cotton, John Cornyn, Ben Sasse, Dianne Feinstein, Ron Wyden, Martin Heinrich, Angus King, Kamala Harris, Michael Bennet, James Lankford, Mark Warner, Peter King, Frank LoBiondo, Trey Gowdy, Tom Rooney, Ileana Ros-Lehtinen, Jeff Miller, Lynn Westmoreland, Joe Heck, Mike Pompeo, Luis Gutierrez, and Patrick Murphy. *See* J.A. 16–17 (Compl. ¶ 26).

targeting of persons within the United States or U.S. persons outside the United States. *Id.* § 1881a(b)(1)–(3).

"Upstreaming" is a "methodology for collecting intelligence information from internet communications" that is used under FISA. J.A. 156 (FBI Decl. ¶ 17). In an "upstream collection," an agency "collects a target's communications as they cross the backbone of the internet with the compelled assistance of companies that maintain those networks." *Id*.

While conducting upstream collection, agencies may incidentally obtain information from or about U.S. persons. When that happens, agencies must employ procedures to "minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information[.]" 50 U.S.C. § 1801(h)(1). Minimization commonly involves substituting a "generic phrase, or term, such as 'U.S. person 1' or 'a named U.S. person'" if disclosing the identity of the U.S. person would "not meet dissemination criteria." J.A. 155 (FBI Decl. ¶ 15). This minimization process is referred to as "masking" the identity of the U.S. person. *Id.* Agencies may request to "unmask" the identity of an individual if that person's identity is "necessary to understand foreign intelligence information or assess its importance[.]" 50 U.S.C. § 1801(h)(2).

**C**

In response to the Project's FOIA request, all six agencies issued *Glomar* responses, declining to search for responsive records and stating that the existence or nonexistence of these records is a fact that itself is exempt from disclosure under FOIA. Specifically, each agency attested that disclosing the

fact of the existence or nonexistence of responsive records would reveal intelligence sources and methods and pose a threat to national security. In doing so, all six agencies invoked Exemption 1. In addition, all agencies other than the Justice Department invoked Exemption 3. The Justice Department also claimed Exemptions 7(A) and 7(C), and the FBI additionally relied on Exemptions 6, 7(C), and 7(E).

The Project filed this lawsuit in the United States District Court for the District of Columbia challenging the agencies' *Glomar* responses. The district court granted the agencies' motion for summary judgment. *See Project for Privacy & Surveillance Accountability, Inc. v. Department of Justice*, No. 20-CV-3657, 2022 WL 4365745 (D.D.C. Sept. 19, 2022). The district court concluded that the agencies were not required to conduct a search for responsive documents prior to issuing their *Glomar* responses, and that the agencies' affidavits supported their *Glomar* responses. *Id.* at \*6, \*11, \*13, \*15. The Project appealed.

## II

The district court had original jurisdiction under 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291. We review the district court's grant of summary judgment in a FOIA case *de novo*, including questions regarding FOIA's statutory requirements and limitations. *National Sec. Archive v. CIA*, 104 F.4th 267, 271 (D.C. Cir. 2024). In deciding whether a claimed exemption supports a *Glomar* response, we also review *de novo* the district court's conclusion that the agencies' *Glomar* responses were proper under the claimed exemption. *See Schaerr*, 69 F.4th at 929; *Knight First Amend. Inst.*, 11 F.4th at 815.

8

**III**

The Project argues that the agencies' *Glomar* responses were insufficient for two reasons. First, the Project insists that FOIA requires agencies to search for records prior to issuing *Glomar* responses. Second, the Project contends that its FOIA requests are broad enough to encompass some records that are not justifiably withheld under the cited exemptions, making a categorical *Glomar* response improper.

Neither argument succeeds. The first is foreclosed by precedent, and the second fails because the agencies' *Glomar* responses to the FOIA requests were properly justified based on Exemption 1 for classified materials.

**A**

The Project first argues that the agencies were obligated to search for records prior to issuing their *Glomar* responses. Absent this initial search, the Project argues, it is impossible for the agencies to know whether they possess any responsive documents that do not necessitate a *Glomar* response.

That argument is foreclosed by circuit precedent. In *Schaerr*, this court held directly that "an agency need not search its records before invoking *Glomar*." 69 F.4th at 928. That makes sense because "'the nature of a *Glomar* response' is to 'narrow the FOIA issue to the existence of records *vel non*.'" *Id.* at 928–929 (quoting *Wolf*, 473 F.3d at 374 n.4); *see also Electronic Privacy Info. Ctr. v. National Sec. Agency*, 678 F.3d 926, 934 (D.C. Cir. 2012) (same). Requiring agencies to search for records, and then report the outcome of that search, would inevitably confirm or deny the existence of responsive records, which is precisely what a *Glomar* response is designed to avoid. FOIA, after all, does not require searches for their

own sake. Searches are a means to the end of making disclosures or withholdings. That process has no application in a *Glomar* case because an agency could not even disclose the outcome of its search without defeating the point of its *Glomar* response.

The Project nonetheless argues that *Schaerr* runs afoul of the FOIA statute. Project Opening Br. 52. This panel is bound by *Schaerr* regardless. *See Honeywell Int'l, Inc. v. EPA*, 705 F.3d 470, 471 (D.C. Cir. 2013); *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) ("One three-judge panel * * * does not have the authority to overrule another three-judge panel of the court.").

In any event, the Project's arguments are without merit.

*First*, the Project points out that FOIA directs agencies to "make reasonable efforts to search for the [requested] records[.]" 5 U.S.C. § 552(a)(3)(C). True enough. But "reasonable efforts" do not include searches the results of which can never be publicly disclosed or discussed without damaging the very interests protected by FOIA exemptions. Avoiding any such disclosure is the whole purpose of *Glomar*. *See Wolf*, 473 F.3d at 374 n.4 ("[T]he nature of a *Glomar* response * * * narrows the FOIA issue to the existence of records *vel non*. Indeed, '[w]hen the Agency's position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal.'") (second alteration in original) (quoting *Phillippi*, 546 F.2d at 1013).

*Second*, the Project cites to FOIA's requirement that "whenever the agency determines that a full disclosure of a requested record is not possible[,]" an agency must "consider

whether partial disclosure of information is possible" and "take reasonable steps necessary to segregate and release nonexempt information[.]" 5 U.S.C. § 552(a)(8)(A)(ii)(I) & (II).

That argument does not work either. The cited provisions apply when record-specific decisions are made about the disclosure or withholding of individual documents. They have no role when even acknowledging the existence or absence of records will harm statutorily protected interests.

In short, *Glomar* applies when even answering the question posed by a FOIA request—do responsive documents exist?—would harm the United States' interests. The Project's efforts to circumvent that harm by asking the subsidiary question of whether records can be searched or redacted fundamentally misunderstands the function of the *Glomar* response and the vital national interests that it protects.

**B**

The Project separately argues that the agencies did not properly invoke *Glomar* in this case. In deciding whether a claimed exemption supports a *Glomar* response, courts can resolve the case "based on agency affidavits alone." *Schaerr*, 69 F.4th at 928 (citation omitted). The agency bears the burden of establishing that the claimed exemption supports its response. 5 U.S.C. § 552(a)(4)(B). An agency is entitled to summary judgment if its affidavit "(1) describes the justifications for nondisclosure with 'reasonably specific detail'; and (2) is not substantially called into question by contrary record evidence or evidence of agency bad faith." *Schaerr*, 69 F.4th at 929 (quoting *Wolf*, 473 F.3d at 374). The agency's justification must be "logical or plausible." *Id.* at 929 (citing *Electronic Privacy Info. Ctr.*, 678 F.3d at 931).

In the national security context, courts exercise "great caution" before compelling an agency to disclose protected information. *Schaerr*, 69 F.4th at 929 (citation omitted). In reviewing FOIA withholdings, we "defer[] to executive affidavits predicting harm to national security[.]" *ACLU v. Department of Defense*, 628 F.3d 612, 624 (D.C. Cir. 2011) (quoting *Center for National Sec. Studies v. Department of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003)).

Each agency invoked Exemption 1 in support of its *Glomar* response. By way of reminder, Exemption 1 imposes both substantive and procedural requirements. Substantively, the exemption authorizes the withholding of information "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy[,]" which here is Executive Order 13,526. 5 U.S.C. § 552(b)(1)(A). Procedurally, Exemption 1 requires the information to be "properly classified pursuant to such Executive order[.]" *Id.*

As the district court concluded, Exemption 1 supports each agency's *Glomar* response in this case. *Project for Privacy & Surveillance Accountability, Inc.*, 2022 WL 4365745, at *11.

**1**

Each agency met the substantive criteria for classification set by Executive Order 13,526. The Order allows information to be classified if "unauthorized disclosure of the information reasonably could be expected to result in damage to the national security," and the agency "identif[ies] or describe[s] the damage." Exec. Order No. 13,526 § 1.1(a)(4); *see also Judicial Watch, Inc. v. Department of Defense*, 715 F.3d 937, 941 (D.C. Cir. 2013).

Each agency submitted an affidavit explaining that disclosing whether it had records concerning the upstreaming or unmasking of any individuals listed in the FOIA request during the specified time periods would gravely harm national security and intelligence activities. The agencies then explained that such harm would result because the records would reveal whether that agency had—or had not—intercepted communications of one or more of the named persons through FISA surveillance, the time period in which the surveillance was undertaken, and whether intelligence reports about FISA surveillance identified those persons. *See* J.A. 93–97 (NSA Decl. ¶¶ 19–27); J.A. 133–138 (CIA Decl. ¶¶ 10–20); J.A. 157–162 (FBI Decl. ¶¶ 19–37); J.A. 211–218 (Justice Dep't Decl. ¶¶ 10–21); J.A. 244–249 (State Dep't Decl. ¶¶ 9–19); J.A. 256–261 (ODNI Decl. ¶¶ 16–26). Those disclosures, in turn, would reveal information about the scope of FISA surveillance during the designated years. In particular, the disclosures could inform individuals interacting with the listed members of Congress either that those individuals were being monitored, allowing them to take evasive activities, or that they were not being monitored, revealing gaps in the government's surveillance methods.

Each agency also explained that disclosing the existence or non-existence of such records would reveal agency intelligence priorities, capabilities, activities, and methods. J.A. 136 (CIA Decl. ¶ 16); J.A. 95–96 (NSA Decl. ¶ 24); J.A. 162 (FBI Decl. ¶ 36); J.A. 216–217 (Justice Dep't Decl. ¶ 20); J.A. 244–245 (State Dep't Decl. ¶ 9); J.A. 259–260 (ODNI Decl. ¶ 24). For example, if an agency were to admit publicly in response to a FOIA request that "no intelligence information about Persons A or B exists," but then in response to a request about Person C "state only that no response could be made," that would indicate that "Person C is or has been a target" of an intelligence investigation, "in communication with a target," or

"the subject of a collected communication." J.A. 96 (NSA Decl. ¶ 25). At the same time, "adversaries would also know that communications of Persons A and B were secure and not subject to * * * surveillance." *Id.*

Similarly, if Person X has communications with Person Y, and an agency denies that it has intelligence records on Person Y, it would "necessarily reveal to our adversaries that Person X's communications are secure and not subject to * * * surveillance." J.A. 96 (NSA Decl. ¶ 25). On the other hand, if an agency confirms that it has intelligence records on Person Y, it would reveal "intelligence priorities" and that "Person X's communications may be unsecure and subject to surveillance[.]" *Id.* "Over time, the accumulation" of this information "would disclose the targets and capabilities, and therefore the sources and methods," of an agency's intelligence collection. *Id.*

In that same way, disclosure of the existence or non-existence of records capturing communications of the listed individuals would reveal areas where the agencies had a lack of interest, inability to obtain information, or general gaps and limitations in their capabilities during the relevant time period. J.A. 96–97 (NSA Decl. ¶ 26); J.A. 161–162 (FBI Decl. ¶ 36); J.A. 260 (ODNI Decl. ¶ 24).

The agencies added that disclosing whether responsive records exist would give "targets, their cohorts, foreign intelligence agencies, and others intent on interfering with [these] investigative efforts information necessary to take defensive actions to conceal criminal activities," as well as to "develop and implement countermeasures to elude detection." J.A. 217 (Justice Dep't Decl. ¶ 20). The affidavits explain that even piecemeal disclosures can provide targets with "a guide or 'road map' that instructs them on which communication

modes or personnel remain secure" and which do not. J.A. 95–96 (NSA Decl. ¶ 25). That could reveal "the success of any evasive techniques." J.A. 260 (ODNI Decl. ¶ 24).

In addition, the State Department's affidavit explained that "[o]fficial public disclosures * * * acknowledge only that the [NSA] engages in upstream collection[,]" meaning that as to all of the other agencies, disclosing whether they have responsive records could reveal whether or not they even engage in upstreaming, or would at least "provide information about how intelligence is shared, analyzed, and used" among the agencies. J.A. 247 (State Dep't Decl. ¶ 14).

By providing that information, the agencies' affidavits properly justified their *Glomar* responses for the same reasons the affidavits sustained the agencies' invocations of *Glomar* in *Schaerr*. 69 F.4th at 929–930. In that case, the FOIA claimant similarly sought documents concerning the unmasking or upstreaming of twenty-one named individuals during a specific time period. *Id.* at 926–927. There, as here, the agency affidavits averred that "confirming or denying the existence of records related to upstreaming or unmasking would damage national security by disclosing agency priorities, capabilities, and methods[,]" as well as "weaknesses, and gaps in intelligence coverage." *Id*. at 929–930. Here, as there, the agencies' careful explanations were sufficient to support the *Glomar* responses.

The Project nonetheless argues that its FOIA requests are broad enough to encompass "policy documents" that would not merit withholding under *Glomar*, such as "a hypothetical agency document titled, 'A Guide to Unmasking of Members of Congress[,]'" "correspondence regarding unmasking of members of Congress generally[,]" or "a letter from a member of Congress informing the FBI that she contemplated

enshrining" procedures to govern the dissemination of intelligence information referring to congressmembers or their staff "by statute[.]" Project Opening Br. 26, 46; Project Reply Br. 7.

That argument fails for the simple reason that the Project's FOIA requests do not seek any such generic policy documents. Instead, the FOIA requests seek exclusively "documents, reports, memoranda, or communications regarding" the "unmasking" and "upstreaming"—"including all requests" for "unmasking" and "upstreaming"—only "of any person" on the list of named individuals, and even then, only for the January 1, 2008 to January 15, 2020 time period. So the Project's requests are, by their own terms, limited to documents regarding the unmasking and upstreaming of named individuals during certain years. Nothing more. As a result, the requests are not written to encompass general policy documents. In other words, the Project's "request was not broadly drawn; it made a specific inquiry," and the "agenc[ies] [were] bound to read it as drafted, not as * * * [the Project] might wish it was drafted." *Miller v. Casey*, 730 F.2d 773, 776–777 (D.C. Cir. 1984) (rejecting the argument that an agency's *Glomar* response was improper because the agency should have "construed [a] request more broadly").

The Project argues that our decision in *People for the Ethical Treatment of Animals v. National Institutes of Health*, 745 F.3d 535 (D.C. Cir. 2014), requires reading its request to include such policy documents. Not so. The two FOIA requests and bases for *Glomar* responses are quite dissimilar.

In particular, the FOIA request in *People for the Ethical Treatment of Animals* sought all records involving "investigations into complaints filed" from 2005 to 2007 "regarding" three named National Institutes of Health grant-

recipient researchers at Auburn University. 745 F.3d at 539. As the court recognized, that language would include not just investigations into the researchers themselves, but any investigation into their employing institution and its own practices and procedures. *Id*. at 544–545. For example, a complaint that Researcher X was operating without sufficient supervision could prompt an investigation into the supervisory rules and requirements at the University just as much as it could prompt an investigation into the individual researcher. *See id*.

In addition, the government's *Glomar* response in *People for the Ethical Treatment of Animals* rested on Exemption 7(C), which protects personal privacy, not classified materials. *See* 5 U.S.C. § 552(b)(7)(C). As a result, to justify a *Glomar* response, the agency had to make a focused showing that the named individuals' personal privacy could reasonably be expected to be invaded, and that the public interest did not outweigh those privacy interests. *People for the Ethical Treatment of Animals*, 745 F.3d at 544–545; *see* 5 U.S.C. § 552(b)(7)(C). But when it came to the University itself, those privacy interests were "diminished," if they existed at all. *People for the Ethical Treatment of Animals*, 745 F.3d at 545; *see FCC v. AT&T Inc.*, 562 U.S. 397, 409–410 (2011) ("The protection in FOIA [Exemption 7(C)] against disclosure of law enforcement information on the ground that it would constitute an unwarranted invasion of personal privacy does not extend to corporations.").

Tellingly, the Project does not point to any language in its FOIA request that could be read to reach beyond its pointedly focused language. Quite the opposite, that the Project took the time to list by name each of the forty-eight individuals about whom it sought information—some in Congress and some no longer in Congress—says quite clearly that the request did not seek information about other unlisted persons, let alone the

entire Congress. While "[a]gencies have 'a duty to construe a FOIA request liberally,'" agencies are under no obligation to rewrite them. *People for the Ethical Treatment of Animals*, 745 F.3d at 540 (quoting *Nation Magazine v. United States Customs Service*, 71 F.3d 885, 890 (D.C. Cir. 1995)).

Finally, the Project points out that "ODNI released in 2020 a once-classified, redacted list of executive branch officials who requested the unmasking of former National Security Advisor Michael Flynn[,]" and insists that this "undermines the Agencies' claim that acknowledging *any* records related to unmasking or upstreaming would *necessarily* threaten national security." Project Reply Br. 9.

That argument tilts at windmills. Nothing in the agency affidavits says that every potential record generically relating to unmasking or upstreaming would automatically trigger a *Glomar* response. And "we have repeatedly rejected the argument that the government's decision to disclose some information prevents the government from withholding other information about the same subject." *ACLU*, 628 F.3d at 625 (collecting cases).

For all of those reasons, the agencies have each shown that their *Glomar* responses met the substantive criteria of Executive Order 13,526.

**2**

The second requirement for invoking Exemption 1 is that each agency must show that the information it seeks to withhold was "classified in accordance with the procedural criteria of the governing Executive Order[.]" *Judicial Watch*, 715 F.3d at 943 (quoting *Lesar v. Department of Justice*, 636

F.2d 472, 483 (D.C. Cir. 1980)). The agencies have each cleared that hurdle.

Under Executive Order 13,526, only "an original classification authority" can classify information. Exec. Order. 13,526, § 1.1(a)(1). Those vested with original classification authority are "(1) the President and Vice President; (2) agency heads and officials designated by the President; and (3) United States Government officials delegated this authority" under the Order. *Id.* § 1.3(a).

Each agency's affidavit showed that the declarant had original classification authority under the Order. *See* J.A. 86, 92–93 (NSA Decl. ¶¶ 1, 18, 19) (Chief of Policy, Information, Performance, and Exports Linda M. Kiyosaki); J.A. 129–130, 134–135 (CIA Decl. ¶¶ 2, 13) (CIA Information Review Officer Vanna Blaine); J.A. 151, 160 (FBI Decl. ¶¶ 2, 31) (Chief of the Record/Information Dissemination Section Michael G. Seidel); J.A. 210, 213 (Justice Dep't Decl. ¶¶ 3, 14) (General Counsel of the National Security Division Patrick N. Findlay); J.A. 241, 249 (State Dep't Decl. ¶¶ 1, 19) (Deputy Assistant Secretary for Analysis and Production of the Bureau of Intelligence and Research Victor Raphael); J.A. 252, 258–259 (ODNI Decl. ¶¶ 3, 19, 23) (Chief of the Information Management Office Gregory M. Koch). That "removes any doubt that a person with original classification authority has approved the classification decision[.]" *Judicial Watch*, 715 F.3d at 944.

The Project invokes two other provisions of the Executive Order—Sections 1.5 and 1.6. Neither affects the validity of the *Glomar* responses.

First, Section 1.5 provides that, "[a]t the time of original classification, the original classification authority shall

establish a specific date or event for declassification based on the duration of the national security sensitivity of the information." Exec. Order. 13,526 § 1.5(a). The Project is correct that no such date was set at the time of classification. But setting such a date is not a procedural precondition to the original classification under the Order. It is a requirement that attaches "[*a*]*t the time of* original classification"—that is, once classification has occurred. *Id.* (emphasis added). It is not part of the process of establishing a permissible basis for classification. That makes sense. Until a classification judgment is validly made, there is no need for a declassification date.

Another section of the Executive Order makes that distinction even more apparent. Section 6.1 of the Order defines "classified information" as "information that has been determined pursuant to this order or any predecessor order to require protection against unauthorized disclosure *and* is marked to indicate its classified status when in documentary form." Exec. Order. 13,526 § 6.1(i) (emphasis added). So while the Order requires that a document be marked to be validly classified, the Order does not similarly make identifying a declassification date a prerequisite to valid classification.

In addition, Section 1.5 itself anticipates that there may be "classified information" that does not have a declassification date. Section 1.5 states that "[n]o information may *remain* classified indefinitely" and provides that "classified information that * * * lacks declassification instructions shall be declassified in accordance with [P]art 3 of [the] [O]rder." Exec. Order. 13,526 § 1.5(d) (emphasis added). By the express terms of Section 1.5, therefore, information may properly be classified even if it lacks a declassification date.

In sum, to properly invoke Exemption 1, the agencies were required to show that their *Glomar* facts were "properly classified pursuant to" the Executive Order, not that they met every post-classification requirement in the Order. 5 U.S.C. § 552(b)(1)(B). The issue here is simply one of ordering. And because nothing in the Executive Order mandates that a declassification date be set *before* information can validly be classified, any delay in setting that date here is beside the point.

The Project also relies on Section 1.6 of the Order, which provides that, "[a]t the time of original classification," the agency must mark the classification level, the original classification authority, the agency and office of origin, declassification instructions, and a concise reason for classification. Exec. Order. 13,526 § 1.6(a).

Like Section 1.5, Section 1.6 sets requirements that occur "*at the time of* original classification," but are not themselves part of the process for the original act of classification. And while the Order defines "classified information" in part as "information that * * * is marked to indicate its classified status *when in documentary form*[,]" that requirement, by its very terms, only applies when the classified information is "*in documentary form*." Exec. Order. 13,526 § 6.1(i) (emphases added).

That marking requirement cannot apply to the *Glomar* fact at issue here—the fact that any response would imperil national security and intelligence operations—since no markings can be made when the relevant fact takes the form not of a physical document, but of an abstract expert mental judgment made by the original classifier who works at the agency. In this case, there simply was no physical record capable of receiving such markings.

The Executive Order anticipates that result. The Order defines the types of "[i]nformation" that can be classified as including "any knowledge that can be communicated or documentary material, regardless of its physical form or characteristics[.]" Exec. Order. 13,526 § 6.1(t). That definition includes *Glomar* facts because the Order says so specifically. *See id.* § 3.6(a) ("An agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order[.]").

So the Executive Order expressly allows for the classification of information that is knowledge, and not just information that is in the form of markable documentary material. The Project recognizes as much. *See* Revised Oral Argument Tr. 19:8–16 (conceding that "the executive order * * * does[ not] obligate everything that[ is] classified to be reduced to documentary form"). And such information is not required to be "marked to indicate its classified status" to be properly classified under the Order. Exec. Order. 13,526 § 6.1(i).

In short, each agency's determination that it could neither confirm nor deny the existence of any records complied with those substantive and procedural prerequisites for classification raised by the Project.

\* \* \* \* \*

Because the agencies' *Glomar* responses complied with both the substantive and procedural classification criteria of Executive Order 13,526, the agencies properly declined to respond to the Project's FOIA requests under Exemption 1.

**IV**

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*